

# SEALED

1  Willard K. Tom
   General Counsel
2
   Robin L. Moore
3  Benjamin J. Theisman
   600 Pennsylvania Avenue, NW
4  Mailstop M-8102B
   Washington, DC 20580
5  Telephone: (202) 326-2167, -2223
   Fax: (202) 326-2558
6  Email: rmoore@ftc.gov, btheisman@ftc.gov

7  Blaine T. Welsh
   Assistant United States Attorney
8  Nevada Bar No. 4790
   333 Las Vegas Blvd. South, Suite 5000
9  Las Vegas, NV 89101
   Telephone: (702) 388-6336
10 Fax: (702) 388-6787
   Email: blaine.welsh@usdoj.gov
11
   Attorneys for Plaintiff
12 Federal Trade Commission

13                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
14

15
   | FEDERAL TRADE COMMISSION, | 2:11-cv-00461-RLH -RJJ |
16
   | Plaintiff, | |
17
   | vs. | [FILED UNDER SEAL] |
18
   | MICHAEL BRUCE MONEYMAKER, a/k/a Bruce Moneymaker, Mike Smith, and Michael Bruce Millerd, individually, as an officer and director of the corporate defendants, and also doing business as Fortress Secured, | |
19
20
21
   | DANIEL DE LA CRUZ, individually, as an officer and director of the corporate defendants, and also doing business as Fortress Secured, | |
22
23
24 | BELFORT CAPITAL VENTURES, INC., a corporation, | |
25

| | |
|---|---|
| 1 | **DYNAMIC ONLINE SOLUTIONS, LLC,** a limited liability company, |
| 2 | |
| 3 | **HSC LABS, INC.,** a corporation, |
| 4 | **RED DUST STUDIOS, INC.,** a corporation, |
| 5 | **SEASIDE VENTURES TRUST,** individually and as an officer and director of the corporate defendants, and |
| 6 | |
| 7 | **JOHN DOE NO. 1,** in his capacity as trustee of Seaside Ventures Trust, |
| 8 | Defendants. |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, the appointment of a receiver, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

### PLAINTIFF

4. The FTC is an independent agency of the United States Government created by

2

1  statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),
2  which prohibits unfair or deceptive acts or practices in or affecting commerce.
3      5.    The FTC is authorized to initiate federal district court proceedings, by its own
4  attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be
5  appropriate in each case, including rescission or reformation of contracts, restitution, the refund
6  of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b) and 56(a)(2)(A).

## DEFENDANTS

8      6.    Defendant Belfort Capital Ventures, Inc. ("Belfort"), also doing business as
9  Centralized Customer Service, is a corporation with its principal place of business at 8668
10 Spring Mountain Road, Suite 101, Las Vegas, Nevada 89117. Belfort also maintains mailing
11 addresses at: (1) 5190 Neil Road, Suite 430, Reno, Nevada 89502; and (2) 8550 West Desert Inn
12 Road, Suite 102-381, Las Vegas, Nevada 89117. Belfort transacts or has transacted business in
13 this district and throughout the United States.
14     7.    Defendant Dynamic Online Solutions, LLC ("Dynamic") is a limited liability
15 company with its principal place of business at 8550 West Desert Inn Road, Suite 102-381, Las
16 Vegas, Nevada 89117. Dynamic also lists a mailing address at 8550 West Desert Inn Road,
17 Suite 101, Las Vegas, Nevada 89117 in its corporate filings. Dynamic transacts or has
18 transacted business in this district and throughout the United States.
19     8.    Defendant HSC Labs, Inc. ("HSC") is a corporation with its principal place of
20 business at 8668 Spring Mountain Road, Las Vegas, Nevada 89117. HSC also maintains
21 mailing addresses at: (1) 35 East Agate #501, Las Vegas, Nevada 89123; and (2) P.O. Box
22 52080, Sparks, Nevada 89431. HSC transacts or has transacted business in this district and
23 throughout the United States.

3

9. Defendant Red Dust Studios, Inc. ("Red Dust") is a corporation with its principal place of business at 8668 Spring Mountain Road, Las Vegas, Nevada 89117. Red Dust also maintains a mailing address at P.O. Box 27740, Las Vegas, Nevada 89126. Red Dust transacts or has transacted business in this district and throughout the United States.

10. Defendant Seaside Ventures Trust ("Seaside") is the managing member of Dynamic. Seaside maintains a mailing address at 8550 West Desert Inn Road, Suite 101, Las Vegas, Nevada 89117. At all times material to this Complaint, acting alone or in concert with others, Seaside formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Seaside, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

11. Defendant John Doe No. 1 ("Doe") is the trustee of Seaside and holds legal title to all of Seaside's assets, including ownership of Dynamic. In his capacity as trustee of Seaside, Defendant Doe, at all times material to this Complaint, acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In his capacity as trustee of Seaside and in connection with the matters alleged herein, Defendant Doe transacts or has transacted business in this district and throughout the United States.

12. Defendant Michael Bruce Moneymaker, also known as Bruce Moneymaker, Mike Smith, and Michael Bruce Millerd ("Moneymaker"), is the registered Director, President, Treasurer, and Secretary of Belfort and was, until July 24, 2009, the registered President and Treasurer of HSC. Defendant Moneymaker also does business as Fortress Secured. At all times material to this Complaint, acting with knowledge, alone or in concert with others, he

4

formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Moneymaker, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13. Defendant Daniel De La Cruz ("De La Cruz") is the registered Director, President, Treasurer, and Secretary of HSC. Defendant De La Cruz also does business as Fortress Secured. At all times material to this Complaint, acting with knowledge, alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant De La Cruz, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14. Defendants Belfort, Dynamic, HSC, and Red Dust (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office locations, centralized payroll functions, and commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Moneymaker, De La Cruz, Seaside, and Doe, acting with knowledge, formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

**COMMERCE**

15. At all times material to this Complaint, Defendants have maintained a substantial

5

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### DEFENDANTS' BUSINESS ACTIVITIES

16. Since at least August 2009, Defendants have been engaging in a common enterprise in which they charge consumers' bank accounts without consumers' knowledge or consent. Defendants obtain consumers' bank account information from websites that claim to match consumers with payday lenders. With this information, Defendants enroll consumers in a variety of "continuity programs," programs for which they charge consumers an initial enrollment fee as well as recurring fees on a weekly or monthly basis until consumers take an affirmative action to cancel. Consumers learn of these charges only when they notice withdrawals from their checking accounts.

17. Since August 2009, Defendants have used various names for their continuity programs, including "Uniguard," "Freedom Subscription," "Illustrious Perks," "Select Platinum Credit," and "Kryptonite Credit." These programs purport to provide consumers a variety of services, such a "Free Stored Value Visa Card, Free Voice mail [sic], Free Airline Tickets and a $10,000 secured credit line." Defendants' business practices follow the same pattern, and consumers' experiences are essentially the same, for each of these plans.

18. In nearly all instances, the consumers that Defendants enroll in their continuity programs first apply for a payday loan online. To apply, consumers provide personal information, including their name, bank routing number, and bank account number.

19. Consumers submit these payday loan applications through payday loan matching sites—websites that represent they will "match" applicants with lenders by forwarding applications to potential lenders. In some instances, consumers submit a payday loan application

directly through websites for payday loan lenders instead of a matching site.

20. In numerous, if not all, instances, consumers do not see any advertisement for Defendants' continuity programs or any disclosure informing them that they are agreeing to enroll in a continuity program.

21. In many instances, however, after consumers submit their personal information, a pop-up box titled "Terms and Conditions" appears over a web page, which includes consumers' personal information and loan rate offers. Consumers faced with this pop-up box on the heels of their payday loan application believe it is associated with their loan application.

22. In fact, consumers have left the payday loan website and the pop-up box is from Defendants. In at least some instances, the web address for the website, including the pop-up box, is within the all-cash-direct.com Internet domain. This Internet domain is registered to Fortress Secured at 35 E. Agate, #501, Las Vegas, Nevada 89123, the same address included on Defendant HSC's most recent corporate filings. Additionally, the Internet registration for this domain lists Defendant De La Cruz as the domain's administrative contact.

23. The pop-up box, however, makes no mention of Defendants or their continuity plans. Rather, the pop-up box instructs consumers to "choose an authorization process," and provides consumers with a choice of providing a digital signature with their mouse or a voice authorization indicating that consumers "agree to the terms and conditions of this site, including the third party trial offers that will automatically be extended to [them] with this application/offer." Many consumers provide a digital signature or voice authorization, believing that they are providing this signature or authorization to the payday loan website.

24. Many consumers, however, do not provide an authorization. Nonetheless, Defendants charge them for Defendants' continuity programs.

25. Having obtained consumers' bank account information through their payday loan applications, Defendants create and deposit "remotely created checks," which draw funds from consumers' bank accounts as payment for the continuity programs. A remotely created check looks like a normal check written by the consumer. But, it is in fact created by the payee purportedly with the consumer's authorization. These types of checks are also sometimes known as "telechecks," "preauthorized drafts," and "paper drafts."

26. A typical check that Defendants create is made payable to one of Defendants' continuity programs. Looking at the check's reverse side, consumers can see that the check was deposited in an account held by or for the benefit of Defendant Belfort or Defendant Dynamic. In numerous instances, these checks also list a name for a third-party payment processor. In numerous instances, the checks list the processors as CheckSite, CSI, AEC, or Elite Debit.

27. Depending on the continuity program, Defendants deposit checks for enrollment fees ranging from $8.42 to $49.99 and then deposit checks for weekly or monthly fees ranging from $8.42 to $19.98.

28. Defendants do not provide the consumers who they enroll in their continuity programs any information about such programs.

29. Additionally, Defendants provide little to no description of the benefits of these continuity programs on the websites dedicated to them. For example, the Select Platinum Credit website, www.spccredit.com, is a single page, the entire content of which is a toll-free customer service number.

30. Likewise, the Freedom Subscription website, which is now disabled, consisted of a single page with only a toll-free customer service number, a mailing address, a link to a different website where consumers could purportedly access the digital or voice authorization

that Defendants claim consumers provided, and an interactive box where a consumer purportedly could engage in a "Live Chat" with a representative.

31. An early version of the Illustrious Perks website was identical to the Freedom Subscription website. Although a more recent version of the Illustrious Perks website has a list of purported benefits available to Illustrious Perks members, information about these benefits can only be accessed after consumers enter user names and passwords for their Illustrious Perks accounts.

32. Like the latest Illustrious Perks website, the website for Kryptonite Credit lists the purported benefits available to Kryptonite Credit members, but requires members to enter a user name and password to access information about these purported benefits.

33. In numerous, if not all, instances, Defendants do not provide consumers with user names or passwords to access the Illustrious Perks or Kryptonite Credit websites.

34. Defendants do not solicit consumers to sign up for continuity programs on any of their websites. Defendants do not provide an application for continuity programs on their websites.

35. Numerous consumers do not discover that Defendants enrolled them into the continuity programs until they review their bank statements and notice that a remotely created check has passed through their accounts, or until their banks contact them because Defendants' remotely created checks caused their accounts to be overdrawn.

36. Once these consumers discover Defendants' charges, they often obtain a copy of the remotely created check from their bank, either by visiting a physical branch or through online banking. Having obtained the checks, consumers then are able to see which continuity program Defendants are billing them for. The consumers also can identify a web address or

phone number for the continuity program, one or both of which appear on the remotely created checks.

37. Many of these consumers then call the phone numbers on the checks to inquire why they were charged and to obtain a refund. Defendants manage many of these phone numbers through an account held by "Fortress Secured" and paid for by Defendant Belfort. Defendant Moneymaker is the signatory for both the account with the phone company and for the debit card in Defendant Belfort's name used to pay for the account.

38. In numerous instances, consumers who call the telephone numbers listed on the remotely created checks or corresponding websites reach a call center located at 8668 Spring Mountain Road, Las Vegas, Nevada 89117.

39. This Las Vegas call center has an exterior "Belfort Capital Ventures" sign. Additionally, Red Dust and HSC are also located at this address and, in the past, have paid the call center employees.

40. Defendants Moneymaker and De La Cruz own and are in charge of this call center business. At times relevant to this complaint, both Defendants Moneymaker and De La Cruz have maintained personal office space at 8668 Spring Mountain Road, Las Vegas, Nevada 89117. Defendants Moneymaker and De La Cruz have knowledge of consumer complaints of unauthorized charges for Defendants' continuity programs. Furthermore, Defendant Moneymaker is a managing member of a separate company, FK Grant Family LLC, which owns the building at 8668 Spring Mountain Road, Las Vegas, Nevada 89117, the call center's address.

41. Defendants instruct call center employees to state that they are a third-party call center and further instruct the employees that they should not reveal the call center's actual address to consumers. Instead, Defendants' call center employees tell consumers the company is

10

located at 8550 West Desert Inn Road, Suite 102-381, Las Vegas, Nevada 89117. This address is a mail box located close to the call center. Beginning in the summer of 2010, however, Defendants instructed call center employees to inform consumers that Illustrious Perks is located at a specified address in Beaverton, Oregon and that Select Platinum Credit is located at a specified address in Rocky Mount, North Carolina. Both of these addresses are mail boxes. In addition, employees tell consumers that Kryptonite Credit is located at a specified address in Petaluma, California. This address is also just a mail box.

42. Many consumers call the numbers on the remotely created checks to ask why they have been charged and to seek refunds for those charges. Defendants tell call center employees they can expect that 90% of consumers calling will be seeking a cancellation, seeking a refund, or asking about the status of a promised refund. Posing as a consumer, an FTC investigator called a number on the Defendants' remotely created checks. A call center employee who identified himself as "James" noted that the call center handles "all the calls because a lot of people will get signed up and say they don't want it [the continuity program], so they'll call and they'll cancel it."

43. Call center employees answering calls from consumers about each continuity program initially ask consumers for identifying information to access consumers' accounts in Defendants' database. Defendants instruct these employees not to tell consumers calling about a particular continuity program about other continuity programs that Defendants may have enrolled those consumers in unless the consumers raise the programs.

44. Additionally, in situations where Defendants enrolled consumers in multiple continuity programs and those consumers ask about more than one program during a single phone call, Defendants have instructed call center employees to refuse to help consumers

11

regarding any continuity program other than the program first mentioned by those consumers. As to any other continuity programs, Defendants have instructed call center employees to deny they have any knowledge of those continuity programs and to tell consumers to call the number associated with Defendants' other continuity programs to dispute any related charges, even though the number connects the consumers to the same call center.

45. Call center employees tell consumers that within the past 60 days they applied for a payday loan online and that the charge is for a third-party offer associated with that online application. Call center employees then explain the purported benefits of the continuity program. For most of the continuity programs, the purported benefits are identical. Specifically, in responses to Better Business Bureau complaints, Defendants stated that the benefits for Freedom Subscription, Illustrious Perks, Select Platinum Credit, and Kryptonite Credit were "a Free Stored Value Visa Card, Free Voice mail [sic], Free Airline Tickets and a $10,000 secured credit line." Defendants state Uniguard is "a comprehensive, consumer-focused, financial, credit, and legal program designed to help family [sic] deal with today's most pressing financial challenges."

46. To persuade complaining consumers that they authorized enrollment, call center employees direct them to a website, www.loanterms.cl, which they claim disclosed to consumers that they would be enrolled in Defendants' continuity programs. That website contained a ten-page document full of legalese titled "Terms and Conditions," in which Defendants buried a single paragraph stating that consumers are approved for a "Risk Free Trial Offer" for Freedom Subscription and authorize Defendants to debit their bank accounts. In numerous, if not all, instances, the terms and conditions located at www.loanterms.cl were not the terms and conditions of the payday loan website that consumers used to apply for payday loans.

47. Defendants have recently replaced www.loanterms.cl with www.loantermsonline.com. This latter website is all but identical to www.loanterms.cl and Defendants link to www.loantermsonline.com from some of their other current websites.

48. Defendants also instruct call center employees to tell consumers that when Defendants enrolled consumers into their continuity programs, consumers received an email with login information and a link to a membership portal.

49. In numerous, if not all, instances, these consumers do not receive an email regarding Defendants' continuity programs.

50. Defendants instruct call center employees to limit the number of refunds offered. At one point Defendants instructed call center employees that no more than 45% of consumers should receive refunds. At that time, Defendants informed call center employees that each refund was a black mark on the employee's performance.

51. Defendants take several steps to thwart consumers seeking refunds. In many instances, call center employees refuse to provide a refund or provide a refund only to the most persistent consumers who call repeatedly.

52. Additionally, in numerous instances, call center employees promise consumers refunds but the consumers never actually receive them. Defendants promise these consumers refunds in 7-10 days, or a similar period. After that time period expires, and Defendants have not yet provided a refund, consumers call asking why they have not yet received a refund. Defendants instruct call center employees to promise a refund within an additional period, in many instances another 7-10 days. Defendants continue these tactics indefinitely until consumers stop calling about the promised refunds.

53. In some instances, call center employees tell consumers that the inquiry is being

"escalated" to a manager who will call those consumers. In numerous instances, those consumers receive no subsequent call from a call center manager.

54. During some periods of time, consumers calling these numbers are not connected to a representative. Instead, these consumers hear a voice message stating the consumers' phone numbers are being placed on a call log and that a customer service representative will call the consumers at a later time. In numerous, if not all, instances, these consumers receive no subsequent call from any customer service representative.

55. In other instances, when consumers call Defendants' customer service numbers, the phone rings for a long period of time and then the line goes dead, with no answer.

56. In other instances, Defendants place consumers on hold indefinitely, never connecting those consumers to a call center employee.

## VIOLATIONS OF THE FTC ACT

57. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

58. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## UNFAIR BILLING PRACTICES

### Count I

59. In numerous instances, Defendants obtain consumers' bank account information and debit those accounts without consumers' express informed consent.

60. Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

61. Therefore, Defendants' practices as described in Paragraph 59 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## DECEPTIVE BILLING PRACTICES

### Count II

62. In numerous instances, Defendants represent, directly or indirectly, expressly or by implication that they will use consumers' authorizations to further their payday loan applications.

63. In truth and in fact, in numerous of these instances Defendants do not use consumers' authorizations to further their payday loan applications, but instead to charge consumers for continuity programs.

64. Therefore, Defendants' representations set forth in Paragraph 62 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III

65. In numerous instances, Defendants make representations to consumers that third-party trial offers will automatically be extended to them.

66. In truth and in fact, when Defendants make this representation, Defendants do not disclose clearly and conspicuously to consumers that they will be charged for Defendants'

15

1 continuity programs.

2     67. Defendants' failure to disclose or disclose adequately the material information described in Paragraph 66 of this Complaint in light of the representation described in Paragraph 65 of this Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DECEPTIVE REFUND PRACTICES

### Count IV

    68. In numerous instances, when consumers contact Defendants to seek cancellations and refunds, Defendants represent, directly or indirectly, expressly or by implication that consumers are not entitled to a refund because they agreed:

    a. to enroll in Defendants' continuity programs;

    b. to pay charges associated with Defendants's continuity programs; and

    c. that they would be entitled to a refund for Defendants' continuity programs only if they asked for a refund during the trial period;

    69. In truth and in fact, in numerous instances in which Defendants make these representations, consumers did not agree:

    a. to enroll in Defendants' continuity programs;

    b. to pay charges associated with Defendants' continuity programs; or

    c. that they would be entitled to a refund for Defendants' continuity programs only if they asked for a refund during the trial period;

    70. Therefore, Defendants' representations set forth in Paragraph 68 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count V

71. In numerous instances, when consumers contact Defendants to seek refunds, Defendants represent, directly or indirectly, expressly or by implication that they will provide refunds.

72. In numerous of these instances, Defendants do not provide refunds.

73. Therefore, Defendants' representations set forth in Paragraph 71 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

74. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

75. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),

1  and the Court's own equitable powers, requests that the Court:

2  A.  Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

7  B.  Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

8  C.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

12 D.  Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

WILLARD K. TOM
General Counsel

Dated: 3/28/11

ROBIN L. MOORE
BENJAMIN J. THEISMAN
600 Pennsylvania Avenue, NW, M-8102B
Washington, DC 20580
Telephone: (202) 326-2167, -2223

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION